UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------x
JEANNE FLIEGER,

                        Plaintiff,

        -against-                          MEMORANDUM & ORDER
                                           13-CV-6282(JS)(GRB)
EASTERN SUFFOLK BOCES,

                        Defendant.
----------------------------------------x
APPEARANCES
For Plaintiff:      Steven A. Morelli, Esq.
                    Law Offices of Steven A. Morelli, P.C.
                    990 Stewart Avenue, Suite 130
                    Garden City, NY 11530

For Defendant:      Adam I. Kleinberg, Esq.
                    Kevin Levine, Esq.
                    Sokoloff Stern LLP
                    179 Westbury Avenue
                    Carle Place, NY 11514


SEYBERT, District Judge:

        Plaintiff Jeanne Flieger ("Plaintiff") commenced this

action alleging violations of the Americans with Disabilities Act,

42 U.S.C. §§ 12111 et. seq. ("ADA").[1]  Presently pending before

the Court is defendant Eastern Suffolk BOCES' ("Defendant" or

"BOCES") motion for summary judgment.  (Docket Entry 28.)  For the

following reasons, Defendant's motion is GRANTED.

---

[1] The Complaint also asserts claims pursuant to the New York
State Human Rights Law, New York Executive Law § 290 et. seq.
(See Compl. ¶¶ 84-85.)  However, Plaintiff has abandoned her
state law claims.  (Pl.'s Br., Docket Entry 33, at 8, n. 4.)

BOCES is a public board of cooperative educational services that "provides shared educational services to public school districts in the region." (Def.'s 56.1 Stmt., Docket Entry 20-1, ¶¶ 1-2.) Plaintiff was hired as a teaching assistant at BOCES in or about March 2003 in the infant toddler program. (Def.'s 56.1 Stmt. ¶ 9; Pl.'s 56.1 Counterstmt.,[3] ¶ 15.1.) Plaintiff is partially deaf and has certain medical conditions as a result of chromosome abnormalities. (Def.'s 56.1 Stmt. ¶ 3.) Plaintiff alleges that from the outset of her employment, she advised the BOCES principal, assistant principal, and certain teachers that "she suffered from hearing loss and that speakers addressing her needed to face her in order for her to comprehend what was spoken to her." (Pl.'s 56.1 Counterstmt. ¶ 7.1.)

Teaching assistants "assist students, plan daily activities, keep attendance records, and monitor students' special education needs" under the direction of a teacher. (Def'.s 56.1 Stmt. ¶ 10.) BOCES alleges that a teaching assistant's "primary duties" include transporting and assisting students in

---

[2] The following material facts are drawn from Defendant's Local Civil Rule 56.1 Statement and Plaintiff's Local Civil Rule 56.1 Counterstatement. Any relevant factual disputes are noted.

[3] Plaintiff's 56.1 Counterstatement pages 1-21 can be found at Docket Entry 27; pages 22-40 at Docket Entry 27-1; and pages 41-61 at Docket Entry 27-2.

wheelchairs; assisting students in gym participation; assisting students with bus steps; holding or escorting students who are a danger to themselves or others; performing CPI training techniques; and assisting students with medical issues. (Def.'s 56.1 Stmt. ¶¶ 11-12.) Plaintiff disputes this job description and alleges that her primary responsibility was to assist her teacher and that she "rarely if ever" assisted wheelchair-bound students or assisted students up and down steps. (Pl.'s 56.1 Counterstmt. ¶ 11.1.)

I.    Transitional Service Program

        During the 2007-2008 school year, Plaintiff began working as a teaching assistant in the Transitional Service Program ("TSP"), which addresses skills for special needs students ages fourteen through twenty-one. (Def.'s 56.1 Stmt. ¶¶ 17-19.) TSP is only in session during the school year. (Def.'s 56.1 Stmt. ¶ 23.) BOCES' Work Activity Center ("WAC") programs are housed at the same Bellport, New York location as TSP. (Def.'s 56.1 Stmt. ¶ 18.) TSP and WAC are part of a program called the Brookhaven Learning Center ("BLC"). (Def.'s 56.1 Stmt. ¶ 18.)

        During the 2008-2009 and 2010-2011 school years,[4] Plaintiff worked under the direction of teacher Kelly Bothwell ("Bothwell"). (Def.'s 56.1 Stmt. ¶ 21.) Plaintiff informed

---

[4] Defendant's 56.1 Statement does not address Plaintiff's assignment for the 2009-2010 school year.

Bothwell that she suffered from hearing loss at the beginning of the assignment. (Defs.' 56.1 Stmt. ¶ 22.) During the 2010-2011 school year, Nancy Smalling ("Smalling") served as Assistant Principal of the BLC and Robert Becker ("Becker") served as BOCES' Director of Special Education and oversaw the summer school program. (Def.'s 56.1 Stmt. ¶¶ 31-34.)

II. 2010 Mayo Clinic Visit

In or about November 2010, Plaintiff advised Smalling and then-Principal Cynthia Croke ("Croke") that she planned to visit the Mayo Clinic in Minnesota pursuant to her doctor's recommendation. (Def.'s 56.1 Stmt. ¶¶ 37-38.) Plaintiff claims that she informed Smalling, Croke, and a Human Resources employee, Nancy Bacelli ("Bacelli"), that she was concerned her absence would be considered in connection with her summer school application. (Def.'s 56.1 Stmt. ¶¶ 40-42.) Plaintiff claims that Smalling, Croke, and Bacelli each told her that her Mayo Clinic visit would not affect her summer school application. (Def.'s 56.1 Stmt. ¶ 43.) Smalling was supportive of Plaintiff's decision to attend the Mayo Clinic and helped her obtain $2,000 to help pay her hotel and airfare expenses from the Employee Assistance Program, a BOCES program that assists current and former employees and their families. (Def.'s 56.1 Stmt. ¶¶ 45-46, 48.) Plaintiff visited the Mayo Clinic from November 30, 2010, through December 6, 2010,

and used paid sick days, rather than medical leave, for her visit. (Def.'s 56.1 Stmt. ¶¶ 49; 53-54.)

III. <u>February 2011 Hearing Loss</u>

In early February 2011, Plaintiff suffered significant hearing loss in her left ear in addition to the hearing loss she already experienced. (Def.'s 56.1 Stmt. ¶ 55.) Plaintiff informed Bothwell of her hearing loss and Bothwell "showed compassion" when they spoke a few days later. (Def.'s 56.1 Stmt. ¶¶ 56-57.) Plaintiff did not advise the BOCES human resources department about her hearing loss and did not request leave or take any sick days. (Def.'s 56.1 Stmt. ¶¶ 62, 64.)

IV. <u>March 2011 Mini Stroke</u>

In March 2011, Plaintiff suffered a "mini stroke." (Def.'s 56.1 Stmt. ¶ 65.) Plaintiff was taken to the hospital and missed two days of school, using paid sick days for the time she missed. (Def.'s 56.1 Stmt. ¶¶ 69-70.) Plaintiff claims that she advised Smalling and Croke of her mini stroke; however, Smalling testified at her deposition that she was not aware of Plaintiff's mini stroke or hospitalization until this lawsuit was commenced. (Def.'s 56.1 Stmt. ¶¶ 71-73.) BOCES alleges that Plaintiff did not discuss summer school eligibility when she allegedly spoke with Smalling; Plaintiff disputes that allegation and avers that she "specifically discussed her concern about summer school with the administration." (Def.'s 56.1 Stmt. ¶ 72; Pl.'s 56.1

Counterstmt. ¶ 72.1.) However, Plaintiff alleges that she expressed her concern to Croke that her absence would impact her summer school application and Croke "told her not to worry about it." (Def.'s 56.1 Stmt. ¶¶ 74-75.)

Plaintiff felt Bothwell's attitude toward her changed following the mini stroke and she became "extremely rude." (Def.'s 56.1 Stmt. ¶ 77; Pl.'s 56.1 Counterstmt. ¶ 79.1.) A few weeks after Plaintiff returned to work, Bothwell allegedly said "[h]ere we go again." Plaintiff also claims that Bothwell ceased having friendly conversations with her and no longer held doors for her. (Def.'s 56.1 Stmt. ¶¶ 78-79.) Plaintiff alleges that Bothwell "express[ed] irritation" that her workload would increase, and she would need to speak louder. (Pl.'s 56.1 Counterstmt. ¶ 59.1)

V.   2011 Summer School Application

During the summers of 2008 through 2010, Plaintiff worked as a teacher at BOCES. (Pl.'s 56.1 Counterstmt. ¶ 23.1.) Summer school positions are not guaranteed. (Defs.' 56.1 Stmt. ¶ 25.) Beginning with the 2011 summer session, BOCES began considering staff attendance in connection with summer hiring. (Def.'s 56.1 Stmt. ¶ 27.) BOCES alleges that pursuant to the Summer 2011 hiring guidelines, prior attendance was considered where an applicant used seven or more sick days; however, one "difficult" year only had a "minimal impact" on the application. (Def.'s 56.1 Stmt. ¶¶ 35-36.)

In or about April 2011, Plaintiff applied for a summer school teaching position. (Def.'s 56.1 Stmt. ¶ 80.) Plaintiff used 11.25 sick days during the 2010-2011 year; 8 sick days during the 2009-2010 year; and 7 sick days during the 2008-2009 year. (Def.'s 56.1 Stmt. ¶¶ 81-84.) BOCES initially rejected Plaintiff's application pursuant to its attendance guidelines. (Def.'s 56.1 Stmt. ¶ 85.) However, Plaintiff alleges that three applicants with "poorer attendance" than her were hired by BOCES as summer staff. (Pl.'s 56.1 Cpimterstmt. ¶ 26.2.)

Plaintiff claims that she spoke to Smalling and Croke, who "indicated they would not get involved in the decision on plaintiff's summer school application." (Def.'s 56.1 Stmt. ¶¶ 87-88.) Defendant alleges that Smalling spoke to Plaintiff's union president, Thelma Shaw ("Shaw"), about Plaintiff's application. (Def.'s 56.1 Stmt. ¶ 89.) In or about May 2011, Plaintiff contacted Shaw, and Shaw contacted Becker or his office; Plaintiff claims that her contact with Becker's office and Shaw were her first discrimination complaints. (Def.'s 56.1 Stmt. ¶¶ 92-93.) Pursuant to Shaw's request, BOCES converted four sick days into personal days, which decreased Plaintiff's sick days for the 2010-2011 school year to 7.25. (Def.'s 56.1 Stmt. ¶¶ 96-97.) Subsequently, Plaintiff was offered a half-day summer school position in Westhampton Beach; however, Plaintiff rejected that

position because of its distance from her home. (Def.'s 56.1 Stmt. ¶¶ 98-99; Pl.'s 56.1 Counterstmt. ¶ 98.1.)

VI.    2011 Back Injury

        Plaintiff was assigned to Bothwell's classroom for the 2011-2012 school year. (Def.'s 56.1 Stmt. ¶ 101.) Plaintiff assisted the wheelchair-bound students in Bothwell's class in getting on and off of the bus. (Def.'s 56.1 Stmt. ¶ 103.) BOCES alleges that one of a teaching assistant's primary duties is "transporting students in wheelchairs and assisting students getting on and off the bus during daily 'bus duty'"; Plaintiff disputes that allegation, and avers that "[t]he 2011/2012 school year was the first year Plaintiff ever had to assist students in wheel chairs." (Def.'s 56.1 Stmt. ¶ 104; Pl.'s 56.1 Counterstmt. ¶ 105.1.) To assist the wheelchair bound students in getting on the bus, Plaintiff pushed them up a small ramp onto a mechanized lift; she did not have to lift the wheelchairs. (Def.'s 56.1 Stmt. ¶¶ 106-107.)

        On September 13, 2011, Plaintiff hurt her back lifting a wheelchair over an approximately two inch lip in the classroom bathroom's entrance. (Def.'s 56.1 Stmt. ¶ 110.) Plaintiff advised Bothwell of her injury but did not leave early or miss work the next day. (Def.'s 56.1 Stmt. ¶¶ 111-12.) Plaintiff met with

Smalling[5] about the injury the next day. (Def.'s 56.1 Stmt. ¶ 113.) Smalling and Assistant Principal Dr. Rock referred Plaintiff to a voluntary employee assistance program that provides counseling services to "employees in crisis." (Def.'s 56.1 Stmt. ¶¶ 116-18.) On September 14, 2011, Plaintiff completed an accident report. (Def.'s 56.1 Counterstmt. ¶ 115.)

Following her back injury, Plaintiff was able to "perform her job with a back brace and without restrictions." (Def.'s 56.1 Stmt. ¶ 121.) Bothwell observed Plaintiff lifting cases of bottled water and Plaintiff sent Bothwell an email indicating that she was able to lift cases of water. (Def.'s 56.1 Stmt. ¶¶ 124-25.)

VII. Job Reassignments

During a meeting on September 21, 2011, Smalling advised Plaintiff that she was being transferred to Josette Celiberti's ("Celiberti") classroom. (Def.'s 56.1 Stmt. ¶¶ 127-28.) Smalling advised Plaintiff that she believed Plaintiff and Bothwell "were no longer an effective team." (Def.'s 56.1 Stmt. ¶ 131.) Smalling indicated that Bothwell had "expressed concerns" in March 2011 and that she was "hesitant" to assign Plaintiff to Bothwell's classroom for the 2011-2012 school year. (Def.'s 56.1 Stmt. ¶ 133.) Plaintiff expressed concerns about Celiberti's low-volume speaking

_____

[5] Smalling became Principal of the BLC in July 2011. (Def.'s 56.1 Stmt. ¶ 100.)

voice but Smalling indicated that Plaintiff could "work it out" with Celiberti.  (Def.'s 56.1 Stmt. ¶¶ 134-35.)

On September 26, 2011, Plaintiff attended a meeting with Smalling, Rock, and her union representative, Bernadette DiGirolamo, to discuss her transfer.  (Def.'s 56.1 Stmt. ¶¶ 139-40.)  Plaintiff believed that her back injury was the reason for her transfer to Celiberti's classroom as the reasons provided by BOCES were "insufficient."  (Def.'s 56.1 Stmt. ¶ 141.)

Plaintiff alleges that Celeberti did not like her "from the start."  (Pl.'s 56.1 Counterstmt. ¶ 150.2.)  Plaintiff claims that Celiberti yelled at her, "told her she 'was making a spectacle' of herself in front of a student," discussed her alleged sewing difficulties in front of students, and "treated her poorly because she did not like [Plaintiff] and because she replaced a Teaching Assistant who Ms. Celiberti liked."  (Def.'s 56.1 Stmt. ¶¶ 144-148.)  Defendant alleges that Celiberti complained about Plaintiff's performance and indicated that Plaintiff failed to adhere to student routines, performed her students' tasks, posted schedules in the classroom contrary to other instructions, and drafted emails during class time.  (Def.'s 56.1 Stmt. ¶ 150.) Plaintiff disputes those allegations and avers that Celiberti's complaints were pretextual.  (Pl.'s 56.1 Counterstmt. ¶ 150.1.)

On October 21, 2011, Plaintiff attended a meeting with Dr. Julie Lutz ("Lutz"), BOCES' Chief Operating Officer, and School

Personnel Officer Jill Diamond ("Diamond"). (Def.'s 56.1 Stmt. ¶ 152.) Plaintiff again asked why she was transferred from Bothwell's classroom and complained about Celiberti. (Def.'s 56.1 Stmt. ¶ 153.) Plaintiff alleges that she requested to be placed with a teacher that spoke sufficiently loud for her to hear. (Pl.'s 56.1 Counterstmt. ¶ 156). On October 27, 2011 Diamond sent Plaintiff a letter summarizing this meeting, indicating that Plaintiff advised she has a disability. Diamond's letter also invites Plaintiff "to provide documentation to determine if she had a disability that required accommodation." (Def.'s 56.1 Stmt. ¶¶ 155-57.) The letter does not indicate that Plaintiff requested a transfer based on her disability. (Def.'s 56.1 Stmt. ¶ 156.)

On October 26, 2011, Plaintiff informed Celiberti for the first time that she suffered from hearing loss. (Def.'s 56.1 Stmt. ¶ 158.) Plaintiff claims that Celiberti stated that she "didn't ask for the deaf assistant." (Def.'s 56.1 Stmt. ¶ 159.) Plaintiff advised Smalling of Celiberti's comment and requested an immediate transfer. (Def.'s 56.1 Stmt. ¶ 162.) Subsequently, Smalling transferred Plaintiff to Joseph Sicuranza's ("Sicuranza") classroom in the BLC. (Def.'s 56.1 Stmt. ¶ 164.)

After she had been transferred to Sicuranza's class, Plaintiff requested a transfer to WAC or the BOCES location in Hauppauge, New York. (Def.'s 56.1 Stmt. ¶¶ 167-68.) Both the WAC program and the BOCES Hauppauge location do not have assigned

administrators. (Def.'s 56.1 Stmt. ¶¶ 169, 172.) BOCES alleges that Smalling did not want to assign Plaintiff to a program without an administrator "[b]ecause plaintiff had not gotten along with her coworkers." (Def.'s 56.1 Stmt. ¶¶ 170, 172.) Plaintiff avers that prior to her transfer to Celiberti's classroom, she did not receive any criticism and had positive evaluations. (Pl.'s 56.1 Counterstmt. ¶ 172.2.)

BOCES support staff, which provides additional assistance for student behavioral issues, is called to BLC classrooms more often than TSP classrooms. (Def.'s 56.1 Stmt. ¶¶ 176-77.) Nevertheless, TSP classrooms also have "frequent student behavioral issues." (Def.'s 56.1 Stmt. ¶ 178.) Plaintiff claims she was concerned about her assignment to the BLC because she believed it was "violent"; Plaintiff alleges that Smalling indicated Sicuranza's classroom was the only opening. (Def.'s 56.1 Stmt. ¶ 179; Pl.'s 56.1 Counterstmt. ¶ 179.2.) While Plaintiff was initially unhappy with her assignment, she later sent an email to Smalling indicating that she enjoyed working in Sicuranza's classroom. (Def.'s 56.1 Stmt. ¶ 180.)

VIII. Internal Complaint

On November 18, 2011, Plaintiff discussed the filing of an internal discrimination complaint with Diamond. (Def.'s 56.1 Stmt. ¶ 181.) On December 19, 2011, Plaintiff met with Diamond and filed a discrimination complaint. (Def.'s 56.1 Stmt. ¶ 182.)

Diamond interviewed Smalling, Bothwell, Celiberti, and a teacher's aide; however, she did not discover any evidence of retaliation or discrimination. (Def.'s 56.1 Stmt. ¶¶ 185-186.) After receiving a letter from Diamond summarizing the findings of her investigation, Plaintiff left Diamond a voicemail stating that she disagreed with Diamond's determination. (Def.'s 56.1 Stmt. ¶¶ 187, 189.) Diamond responded in writing and advised Plaintiff that pursuant to BOCES policy, if she was dissatisfied, she was "'encouraged and expected to bring the matter to the attention of the District Superintendent or the Board.'" (Def.'s 56.1 Stmt. ¶ 190.)

IX. December 2011 Injury

On December 15, 2011, Plaintiff was injured when a male teenage student attacked her in Sicruanza's classroom. (Def.'s 56.1 Stmt. ¶ 191.) Plaintiff claims that Rock told her that she "should have been able to restrain the student and had acted unprofessionally." (Def.'s 56.1 Stmt. ¶ 192.) Plaintiff went to the emergency room and did not return to work. (Def.'s 56.1 Stmt. ¶¶ 194-95.) First, Plaintiff used her sick days and sick days from her union's sick bank; then, Plaintiff received worker's compensation benefits. (Def.'s 56.1 Stmt. ¶¶ 196-97.)

In or about February 2012, Plaintiff requested to return to BOCES in a "non-violent" or "light duty" environment. (Def.'s

56.1 Stmt. ¶ 204.)  Plaintiff did not want to return to "certain classrooms where she felt at risk."  (Def.'s 56.1 Stmt. ¶ 209.)

As of March 15, 2012, Plaintiff's physician, Dr. Gus Katsigiorgis, indicated that Plaintiff was "'totally disabled at this time.'"  (Def.'s 56.1 Stmt. ¶ 205.)  BOCES alleges that when Plaintiff's "light duty" request was denied, Plaintiff claimed that her doctor would not permit her to return for the remainder of the 2011-2012 school year.  (Def.'s 56.1 Stmt. ¶ 216.) Plaintiff alleges that she "suggested a number of reasonable accommodations" but BOCES did not present any accommodations for her to consider.  (Pl.'s 56.1 Counterstmt. ¶ 218.1.)

On August 15, 2012, Plaintiff's worker's compensation attorney sent a letter to Diamond stating that Plaintiff "'can not [sic] do all the usual functions of her job'" and requesting an accommodation for a position in a non-violent setting.  (Def.'s 56.1 Stmt. ¶ 219.)  On August 17, 2012, Plaintiff's worker's compensation attorney sent a letter containing Plaintiff's signature that requested an extension of Plaintiff's medical leave of absence.  (Def.'s 56.1 Stmt. ¶¶ 220-21.)

On September 10, 2012, Plaintiff attended a meeting with Diamond and her union representative, Pat Copertino.  (Def.'s 56.1 Stmt. ¶ 224.)  Plaintiff provided a note from Dr. Katsigiorgis dated September 4, 2012, stating that Plaintiff could return to "light duty work" that does not involve lifting, pushing, or

pulling. (Def.'s 56.1 Stmt. ¶ 228.) Defendant alleges that on August 23, 2012, Dr. Katsigiorgis examined Plaintiff in connection with her worker's compensation case and determined that she was totally disabled and could not return to work. (Def.'s 56.1 Stmt. ¶ 229.) Plaintiff disputes that allegation and avers that her physician's 2012 disability determination "related solely to the percentage of Plaintiff's 'temporary impairment.'" (Pl.'s 56.1 Counterstmt. ¶ 229.1.) Plaintiff does not dispute that she requested that Dr. Katsigiorgis "write another note going against his medical opinion so she could return to work." (Def.'s 56.1 Stmt. ¶ 230.) At the September 2012 meeting, Plaintiff stated that she was unable to push a wheelchair or lift heavy objects, and that she "could only return to a 'non-violent' setting." (Def.'s 56.1 Stmt. ¶¶ 234, 236.)

Plaintiff claims that BOCES advised her that there were no "light duty" teaching assistant positions and that they could not accommodate her based on her responses to questions regarding the teaching assistant job description. (Def.'s 56.1 Stmt. ¶ 237.) Plaintiff spoke with her union representative and indicated, at the meeting, that she wished to extend her leave of absence. (Def.'s 56.1 Stmt. ¶ 238.) Plaintiff requested this extension in a handwritten note dated September 10, 2012, which was provided to Diamond. (Def.'s 56.1 Stmt. ¶ 239.) Plaintiff claims that she requested a "light duty" assignment approximately three times

following the September 2012 meeting and that each time, Diamond advised her that there were no "light duty" assignments. (Def.'s 56.1 Stmt. ¶ 242.)

On August 30, 2013, Plaintiff attended a meeting with Diamond and Dr. Terri McSweeny ("McSweeney"), Assistant Superintendent for Human Resources, regarding her ability to return to work for the upcoming school year. (Def.'s 56.1 Stmt. ¶ 243.) Plaintiff submitted a note from her orthopedist stating that Plaintiff "'may return to work with the following limitations: Desk work only with frequent breaks. No lifting, pulling, pushing, bending, no restraining, [plaintiff] may sit with frequent breaks.'" (Def.'s 56.1 Stmt. ¶¶ 244-45.) Plaintiff does not dispute that she told BOCES she could not perform certain essential functions of the teaching assistant job, particularly, pushing or lifting wheelchairs and restraining students. (Def.'s 56.1 Stmt. ¶ 247; Pl.'s 56.1 Counterstmt. ¶ 247.2.) Plaintiff also does not dispute that she told BOCES she "could not restrain, hold, or escort a student in danger of causing injury to themselves or others," and she could not administer crisis prevention tactics. (Def.'s 56.1 Stmt. ¶¶ 252, 254.) Later that day, McSweeney and Diamond advised Plaintiff that BOCES could not provide the requested accommodation. (Def.'s 56.1 Stmt. ¶ 259.)

On September 17, 2013, Plaintiff sent Diamond a letter indicating that she was "'forced to extend [her] leave of absence

because the agency is unwilling/unable to accommodate [her] doctor's restrictions so that [she] could return to work.'" (Def.'s 56.1 Stmt. ¶ 263.) Diamond responded in a letter in which she summarized the August 2013 meeting, listed certain essential functions that Plaintiff was unable to perform, and clarified that BOCES does not have any "desk work only" teaching assistant positions. (Def.'s 56.1 Stmt. ¶ 264.) Diamond also indicated that Plaintiff's requested accommodations would create "undue hardship," but advised that BOCES would extend Plaintiff's medical leave as an accommodation. (Def.'s 56.1 Stmt. ¶¶ 265-66.) Plaintiff did not make any other requests for accommodation. (Def.'s 56.1 Stmt. ¶ 267.)

Plaintiff filed two Worker's Compensation Board claims: one claim with respect to her September 2011 injury and one with respect to her December 2011 injury. (Def.'s 56.1 Stmt. ¶ 268.) Plaintiff was receiving worker's compensation payments for one or both of her claims as of September 17, 2014. (Def.'s 56.1 Stmt. ¶ 269.) Plaintiff remains on medical leave, and was not looking for other employment as of September 17, 2014. (Def.'s 56.1 Stmt. ¶¶ 270, 272.)

X.  The Pending Motion

On November 13, 2013, Plaintiff commenced this action asserting, inter alia, claims for discrimination, failure to

17

accommodate, retaliation, and hostile work environment in contravention of the ADA. (Compl. ¶¶ 84-85.)

On September 9, 2015, BOCES filed a motion for summary judgment. (Def.'s Mot., Docket Entry 28.) BOCES alleges that Plaintiff cannot establish an ADA discrimination claim because: (1) Plaintiff's back injury is not a "disability" pursuant to the ADA as it did not limit her major life activities (Def.'s Br., Docket Entry 32, at 4-6); (2) Plaintiff's job reassignments during the 2011-2012 school year and 2011 summer school placement do not constitute adverse employment actions (Def.'s Br. at 7-9, 13-14); (3) Even if the Court considers Plaintiff's job reassignments and/or summer school placement to be adverse employment actions, Plaintiff cannot demonstrate causation and BOCES had non-discriminatory reasons for those actions (Def.'s Br. at 9-15).

BOCES also argues that Plaintiff cannot establish a failure to accommodate claim because: (1) she was not able to perform many of the teaching assistant position's essential functions with or without accommodation, and (2) she has failed to demonstrate that an accommodation exists that would permit her to perform these essential functions. (Def.'s Br. at 15-18.) BOCES further avers that it provided Plaintiff with a reasonable accommodation by permitting her to take indefinite medical leave. (Def.'s Br. at 18-20.)

BOCES also alleges that Plaintiff cannot establish a retaliation claim based on her classroom reassignments and/or the denial of her request for a "light duty" assignment. (Def.'s Br. at 21.) Particularly, BOCES argues that: (1) there is no causal connection between a protected activity and the transfer to Celiberti's classroom, (2) Plaintiff's requested transfer out of Celiberti's classroom was not an adverse action based on Plaintiff's transfer request, and (3) there is no causal connection between the denial of Plaintiff's "light duty" requests and her discrimination complaints. (Def.'s Br. at 22-23.)

Finally, BOCES argue that Plaintiff cannot establish a hostile work environment based on stray comments. (Def.'s Br. at 24-25.)

A.    Plaintiff's Opposition

Plaintiff argues that she has established a prima facie disability discrimination claim. (Pl.'s Br., at 9-10.) Plaintiff alleges that her hearing loss, September 2011 back injury, and December 2011 injury constitute disabilities pursuant to the ADA (Pl.'s Br. at 11-12), and her job reassignments and denial of a summer school position constitute adverse employment actions (Pl.'s Br. at 12-14). Plaintiff further avers that BOCES' purported non-discriminatory reasons for these adverse actions are pretextual, as Plaintiff was denied a summer teacher position because she attended the Mayo Clinic. (Pl.'s Br. at 16.)

Plaintiff argues that the notion that Plaintiff and Bothwell were not an effective teaching team should also be rejected as a pretextual basis for her reassignment. (Pl.'s Br. at 16.)

Plaintiff alleges that BOCES retaliated against her by: (1) refusing to hire her for summer school; (2) transferring her out of two classrooms; and (3) transferring her to a classroom with violence-prone students. (Pl.'s Br. at 17.) Plaintiff appears to allege that these retaliatory acts were committed because of her attendance at the Mayo Clinic and/or her hearing impairment. (Pl.'s Br. at 17-18.)

Plaintiff also argues that she has stated a hostile work environment claim based on Celiberti's rude behavior, offensive comment, and soft speaking voice. Plaintiff notes that Smalling was aware of Plaintiff's hearing loss when she transferred her to Celiberti's classroom and ignored Plaintiff's concern about Celiberti's low speaking voice. Additionally, Plaintiff alleges that Smalling transferred Plaintiff to a classroom with violence-prone students even though she was aware of Plaintiff's medical issues. (Pl.'s Br. at 18-19.)

Finally, Plaintiff argues that she has stated a claim for failure to accommodate. (Pl.'s Br. at 22-24.) Plaintiff argues that her request for placement in a non-violent classroom was reasonable and that BOCES' claim that "a Teaching Assistant must perform all primary duties of a Teaching Assistant [is] not

supportable." (Pl.'s Br. at 23 (emphasis in original).) Further, Plaintiff argues that BOCES' position that Plaintiff was unable to perform her job's essential functions "regardless of the setting" is meritless. (Pl.'s Br. at 24.)

DISCUSSION

## I. Legal Standard

Summary judgment will be granted where the movant demonstrates that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A genuine factual issue exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed 2d 202 (1986). In determining whether an award of summary judgment is appropriate, the Court considers the pleadings, deposition testimony, interrogatory responses, and admissions on file, together with other firsthand information that includes but is not limited to affidavits. Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011).

The movant bears the burden of establishing that there are no genuine issues of material fact. Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1223 (2d Cir. 1994). Once the movant makes such a showing, the non-movant must proffer specific facts demonstrating "a genuine issue for trial." Giglio v. Buonnadonna Shoprite LLC, No. 06-CV-5191, 2009 WL 3150431, at

*4 (E.D.N.Y. Sept. 25, 2009) (internal quotation marks and citation omitted). Conclusory allegations or denials will not defeat summary judgment. Id. However, in reviewing the summary judgment record, "'the court is required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'" Sheet Metal Workers' Nat'l Pension Fund v. Vadaris Tech. Inc., No. 13-CV-5286, 2015 WL 6449420, at *2 (E.D.N.Y. Oct. 23, 2015) (quoting McLee v. Chrysler Corp., 109 F.3d 130, 134 (2d Cir. 1997)).

The Second Circuit has expressed the need for caution in awarding summary judgment to the defendant in a discrimination case where "the merits turn on a dispute as to the employer's intent." Holcomb v. Iona College, 521 F.3d 130, 137 (2d Cir. 2008). Notwithstanding the Court's need for caution, "'[i]t is now beyond cavil that summary judgment may be appropriate even in the fact-intensive context of discrimination cases.'" Castro v. City of N.Y., 24 F. Supp. 3d 250, 259 (E.D.N.Y. 2014) (quoting Abdu-Brison v. Delta Air Lines, Inc., 239 F.3d 456, 466 (2d Cir. 2001)).

Discrimination, retaliation, and failure to accomodate claims under the ADA are analyzed using the burden shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). Snowden v. Trustees of Columbia Univ., 612 F. App'x 7, 8 (2d Cir. 2015); Rodriguez v.

22

Verizon Telecom, No. 13-CV-6969, 2014 WL 6807834, at *2 (S.D.N.Y. Dec. 3, 2014). Pursuant to this framework, the plaintiff bears the initial burden of demonstrating a prima facie case; then, the defendant bears the burden of establishing a "legitimate, non-discriminatory reason for its actions." Rodriguez, 2014 WL 6807834, at *2 (citation omitted). If the defendant makes such a showing, the burden shifts back to the plaintiff to establish that the defendant's explanation is merely pretextual. Id. Where a discrimination claim is based on both adverse employment actions and the employer's failure provide an accommodation, "the plaintiff bears the burdens of both production and persuasion as to the existence of some accommodation that would allow [her] to perform the essential functions of [her] employment." McMillan v. City of N.Y., 711 F.3d 120, 126 (2d Cir. 2013) (internal quotation marks and citation omitted).

## II.  Intentional Discrimination

The ADA prohibits discrimination against a "qualified individual on the basis of disability" in the "terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). To state a claim for discrimination under the ADA, a plaintiff must allege that: "(1) the defendant is covered by the ADA; (2) plaintiff suffers from or is regarded as suffering from a disability within the meaning of the ADA; (3) plaintiff was qualified to perform the essential functions of the job, with or without reasonable

accommodation; and (4) plaintiff suffered an adverse employment action because of [her] disability or perceived disability." Capobianco v. City of N.Y., 422 F.3d 47, 56 (2d Cir. 2005) (citation omitted). While discriminatory intent may be inferred based on the totality of the circumstances, the plaintiff "cannot rely solely on conclusory allegations of discrimination without any concrete evidence to support her claims." Sherman v. Cty. of Suffolk, 71 F. Supp. 3d 332, 347 (E.D.N.Y. 2014) (internal quotation marks and citation omitted).

Here, the parties do not dispute that Defendant is covered by the ADA. Additionally, BOCES does not argue that Plaintiff was not qualified to perform her job in the context of her discrimination claim. The Court will address the remaining elements of an ADA discrimination claim in turn.

A.    Disability Within the Meaning of the ADA

BOCES does not dispute that Plaintiff's hearing impairment and December 2011 back injury constitute disabilities within the meaning of the ADA. (See generally Def.'s Br. at 5-6.) However, BOCES argues that Plaintiff's September 2011 back injury does not constitute a disability. (Def.'s Br. at 5-6.) The Court agrees.

"Disability" is defined in the ADA as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment;

or (C) being regarded as having such an impairment." 42 U.S.C. 12102(1). The ADA's definition of "disability" must be "construed in favor of broad coverage of individuals under the [ADA] to the maximum extent permitted by the [ADA]." 42 U.S.C. § 12102(4)(A).

"Major life activities include, without limitation, '[c]aring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, sitting, reaching, lifting, bending, speaking [and] breathing[.]'" Farina v. Branford Bd. of Educ., 458 F. App'x 13, 15 (2d Cir. 2011) (quoting 29 C.F.R. § 1630.2(i)(1)(i); alterations in original). While the ADA does not elaborate on what constitutes a substantial limitation, "the EEOC regulations promulgated after the enactment of the [ADA Amendments Act of 2008] make clear that the standard 'is not meant to be . . . demanding,' and 'should not demand extensive analysis.'" Krachenfels v. N. Shore Long Island Jewish Health Sys., No. 13-CV-0243, 2014 WL 3867560, at *13 (E.D.N.Y. Jul. 29, 2014) (quoting 29 CFR 1630.2(j)(1)(i) and 1630.2(j)(1)(iii) (ellipsis in original)).

The Court finds that Plaintiff has failed to establish that her September 2011 back injury was a physical impairment that substantially limited one or more major life activities. Plaintiff does not dispute that she did not leave work early on the day that she was injured and she returned to work the next day. (Pl.'s Tr.

93:20-24.[6]) Plaintiff did not recall whether she missed any other days of work due to her back injury. (Pl.'s Tr. at 94:10-14.) Plaintiff also testified that she was able to perform her job after her September 2011 back injury with a back brace and without any other restrictions. (Pl.' Tr. 98:7-12.) Plaintiff has failed to proffer any evidence that this back injury impacted her life activities and merely generally asserts that this injury "substantially limited her ability to lift objects and transport wheelchairs." (Pl.'s Br. at 11.) Moreover, Plaintiff does not dispute that she sent an email to Bothwell on September 15, 2011, two days after her injury, in which she stated: "I will continue to push the broken wheelchairs and do everything I did before this happened. Lifting water doesn't hurt my back because I bend at the knees. Therefore, there is NO strain on a person[']s back at all. . . ." (Def.'s Decl., Ex. I, Docket Entry 29-2, at 299-300; see also Pl.'s 56.1 Counterstmt. ¶ 125.)

The Court finds that Plaintiff's completion of an accident report with respect to her back injury is not probative as to whether her life activities were substantially impacted. The accident report contains a description of the incident, states that the nature of the injury is "mid back," and indicates that

_____

[6] Plaintiff's Deposition Transcript ("Pl.'s Tr.") can be found at Exhibit C to Defendant's Declaration (Docket Entry 29-1) at ECF pages 39-369.

Plaintiff did not receive immediate medical care or lose any work time beyond the date of the incident. (Def.'s Decl., Ex. H, Docket Entry 29-2, at 297-98.) Similarly, the fact that Plaintiff filed a worker's compensation claim in connection with the September 2011 back injury is also unpersuasive with respect to whether she was disabled pursuant to the ADA. See George v. TJX Companies, Inc., No. 08-CV-0275, 2009 WL 4718840, at *7 (E.D.N.Y. Dec. 9, 2009) ("[A]dministrative records such as Workers' Compensation awards . . . are insufficient for the purposes of establishing the existence of a disability under the ADA.") (citation omitted). The Court notes that Plaintiff was not awarded worker's compensation payments in connection with her claim for her September 2011 back injury. (Pl.'s Tr. 96:7-9.) Accordingly, Plaintiff's September 2011 back injury does not constitute an ADA disability and will not be considered with respect to her discrimination claim.

B.    Adverse Employment Action

An "adverse employment action" is defined as a change in the terms and conditions of employment that is "materially adverse." Caskey v. Cty. of Ontario, 560 F. App'x 57, 59 (2d Cir. 2014) (internal quotation marks and citation omitted). Examples of adverse employment actions include a termination, demotion evidenced by a wage or salary decrease, a "less distinguished title," material reduction of benefits, or a significant

diminishing of the employee's material responsibilities. Id.
However, an individual's "bruised ego," reassignment to a position
that is more inconvenient, or demotion that does not include a
change in responsibilities, benefits, compensation, or prestige do
not constitute material adverse employment actions. Hong Yin v.
N. Shore LIJ Health Sys., 20 F. Supp. 3d 359, 373 (E.D.N.Y. 2014).

Here, Plaintiff has alleged three adverse employment
actions: (1) the denial of a full-time summer school position; (2)
the transfer from Bothwell's classroom to Celiberti's classroom;
and (3) the transfer from Celiberti's classroom to Sicuranza's
classroom. (Pl.'s Br. at 12.)[7] The Court will address each alleged
adverse employment action in turn.

i.   Denial of Full-time Summer School Position

"Not receiving a requested or desired assignment is not
an adverse employment action." Valenti v. Massapequa Union Free
Sch. Dist., No. 09-CV-0977, 2012 WL 1038811, at *14 (E.D.N.Y. Mar.
28, 2012) (Holding, in the context of a gender discrimination
claim, that the school's refusal to assign a student observer to

---

[7] To the extent Plaintiff argues that Bothwell's and Celiberti's
complaints about her are negative evaluations and, thus, adverse
employment actions, the Court disagrees. (See Pl.'s Br. at 14.)
Plaintiff has not proffered any evidence that the teachers'
complaints constituted evaluations or that any evaluation was
based on these complaints. Needless to say, Bothwell's and
Celiberti's complaints to BOCES administrators are not
materially adverse changes in the terms and conditions of
Plaintiff's employment that would qualify as adverse employment
actions.

all of the plaintiff's classes was not an adverse employment action.).  See also Rodriguez v. Glen Cove City Sch. Dist., No. 14-CV-3815, 2016 WL 951524, at *4 (E.D.N.Y. Mar. 8, 2016) (Holding that the plaintiff did not suffer an adverse employment action when she was not selected as a teacher for a Saturday program.); Ruggieri v. Harrington, 146 F. Supp. 2d 202, 217 (E.D.N.Y. 2001) (Holding, in the context of a Title VII retaliation claim, that the university's denial of the plaintiff's request to teach certain summer courses was not an adverse employment action.).

Plaintiff does not dispute that her Collective Bargaining Agreement does not reference summer positions and that summer positions are not otherwise guaranteed.  (Pl.'s 56.1 Counterstmt. ¶¶ 24-25.)  Accordingly, BOCES' denial of Plaintiff's desired full-time summer position is not an adverse employment action.  It is worthy of note that while Plaintiff's application was initially denied based on her absences during prior years, BOCES later converted certain of her sick days into personal days that would not be counted against her and offered Plaintiff a half-day summer teaching assistant position.  (Def.'s 56.1 Stmt. ¶¶ 80-82, 85, 97-98.)

ii.  Transfer to Celiberti's Classroom

An involuntary transfer constitutes an adverse employment action where the plaintiff's new assignment was "materially less prestigious, materially less suited to his [or

29

her] skills and expertise, or materially less conducive to career advancement." <u>Koontz v. Great Neck Union Free Sch. Dist.</u>, No. 12-CV-2538, 2014 WL 2197084, at *5 (E.D.N.Y. May 27, 2014) (internal quotation marks and citations omitted; alteration in original). Conversely, job reassignments are not adverse employment actions where they "do not radically change the nature of work[.]" <u>Id.</u> (internal quotation marks and citations omitted).

The Court finds that Plaintiff's transfer from Bothwell's classroom to Celiberti's classroom does not constitute an adverse employment action. It is undisputed that this transfer did not result in a change of title, job description, or pay. Plaintiff has not alleged that the position came with less prestige or somehow impeded her career advancement. Although Plaintiff notes that she expressed concerns to Smalling about Celiberti's low speaking voice, (Pl.'s Br. at 12), the Court finds that Celiberti's allegedly low speaking voice did not render Plaintiff's new assignment materially less suited to her skills. While Plaintiff alleges that she was displeased with this transfer, "if a transfer is truly lateral . . . the fact that the employee views the transfer either positively or negatively does not of itself render the denial or receipt of the transfer [an] adverse employment action." <u>Giambattista v. Am. Airlines, Inc.</u>, 5 F. Supp. 3d 284, 293 (E.D.N.Y. 2014), <u>aff'd</u>, 584 F. App'x 23 (2d Cir. 2014)

(internal quotation marks and citation omitted; second alteration in original).

### iii. Transfer to Sicuranza's Classroom

The Court construes Plaintiff's opposition as asserting that her transfer to Sicuranza's classroom constitutes an adverse employment action. (See Pl.'s Br. at 12 ("Soon after Plaintiff reported the discriminatory comment uttered by Celiberti and the indifference to the medical issues, Principal Smalling transferred her again but not before refusing to speak clearly to Plaintiff.").) The fact that Plaintiff requested a transfer out of Celiberti's classroom weighs against a finding that such transfer constituted an adverse employment action. Cf. McLean v. Metro. Jewish Geriatric Center, No. 11-CV-3065, 2013 WL 5744467, at *8 (E.D.N.Y. Oct. 23, 2013) ("That [plaintiff] requested the transfer belies the contention that the transfer constituted an adverse employment action, because it is unlikely that [plaintiff] would seek a lesser position, or one in which she was worse off."). Like Plaintiff's transfer to Celiberti's classroom, Plaintiff's transfer to Sicuranza's classroom did not result in any change in title, pay, location, or the loss of another material benefit. Indeed, Plaintiff concedes that she enjoyed working in Sicuranza's classroom. (Pl.'s 56.1 Counterstmt. ¶ 180.1.) However, one marked distinction between Plaintiff's prior assignments and her assignment in Sicuranza's classroom is that Sicuranza's students

31

had violent tendencies.[8]  Accordingly, the Court finds that Plaintiff's transfer to Sicuranza's classroom constitutes an adverse employment action.

C.    Inference of Discrimination

Perplexingly, Plaintiff references her transfer to Sicuranza's classroom in the context of adverse employment actions and then fails to proffer any argument that this alleged adverse employment action occurred under circumstances giving rise to a discriminatory inference.  (See generally Pl.'s Br. at 15-17.) Thus, Plaintiff has failed to state a prima facie case of discrimination with respect to her transfer to Sicuranza's classroom.  In any event, the Court notes that BOCES has proffered legitimate, non-discriminatory reasons for Plaintiff's transfer to Sicuranza's class, namely, that Plaintiff requested the transfer and in light of Plaintiff's difficult working relationships with Bothwell and Celebriti, BOCES determined that she should be placed at a location with an administrator on site.  (Def.'s Br. at 12.)

---

[8] A close reading of Defendant's submissions indicates that Defendant does not allege that the students in Sicuranza's classroom did not have violent tendencies.  (See, e.g., Def.'s Resp. to Pl.'s 56.1 Counterstmt., Docket Entry 31.)  Plaintiff's allegation that there were violence-prone students in Sicuranza's class, see, e.g., Pl.'s 56.1 Counterstmt. ¶ 179.2, is supported by the undisputed fact that Plaintiff was physically attacked by a student in Sicuranza's class in December 2011.  (Def.'s 56.1 Stmt. ¶ 191.)

Accordingly, BOCES' motion for summary judgment on Plaintiff's disability discrimination claim is GRANTED.

III. <u>Failure to Accommodate</u>

"The fail[ure] to reasonably accommodate an employee's disability is a type of discrimination." <u>Farina</u>, 458 F. App'x at 15 (citing 42 U.S.C. § 12112(b)(5)(A)). A plaintiff states a <u>prima facie</u> failure to accommodate claim pursuant to the ADA by establishing:

> (1) Plaintiff is a person with a disability under the meaning of the ADA; (2) an employer covered by the statute had notice of his disability; (3) with reasonable accommodation, plaintiff could perform the essential functions of the job at issue; and (4) the employer has refused to make such accommodations.

<u>McMillan</u>, 711 F.3d at 125-26. Here, Plaintiff argues that BOCES refused to provide her with an accommodation following her December 2011 back injury. (Pl.'s Br. at 22.) BOCES does not dispute that Plaintiff's December 2011 back injury resulted in an ADA disability or that it had notice of Plaintiff's disability. (<u>See</u> <u>generally</u> Def.'s Br. at 15-17.)

The Court's determination of a job's essential functions is fact-specific and necessitates an "'inquiry into both the employer's description of a job and how the job is actually performed in practice.'" <u>Snowden</u>, 612 F. App'x at 9 (quoting <u>McMillan</u>, 711 F.3d at 126). Relevant factors include, but are not

limited to: "'the employer's judgment, written job descriptions, the amount of time spent on the job performing the function, the mention of the function in a collective bargaining agreement, the work experience of past employees in the position, and the work experience of current employees in similar positions.'"  Id. (quoting McMillan, 711 F.3d at 126.)[9]  However, "'[a] reasonable accommodation can never involve the elimination of an essential function of a job.'"  O'Dette v. N.Y. State Unified Court Sys., No. 12-CV-2680, 2013 WL 1623597, at *6 (E.D.N.Y. Apr. 15, 2013) (quoting Shannon v. N.Y. City Transit Auth., 332 F.3d 95, 100 (2d Cir. 2003) (Noting that EEOC regulations define "essential functions" as "fundamental duties to be performed in the position in question, but not functions that are merely marginal.")).  Additionally, the employer's determination of the essential

---

[9] EEOC regulations state that evidence of a job's essential functions include, without limitation:

> (i) The employer's judgment as to which functions are essential; (ii) Written job descriptions prepared before advertising or interviewing applicants for the job; (iii) The amount of time spent on the job performing the function; (iv) The consequences of not requiring the incumbent to perform the function; (v) The terms of a collective bargaining agreement; (vi) The work experience of past incumbents in the job; and/or (vii) The current work experience of incumbents in similar jobs.

29 C.F.R. § 1630.2(n).

functions of the position is entitled to "'considerable deference.'" <u>Pesce v. N.Y. City Police Dep't</u>, --- F. Supp. 3d ---, 2016 WL 468244, at *7 (S.D.N.Y. 2016) (quoting <u>McMillan</u>, 711 F.3d at 126).

BOCES has submitted a teaching assistant job description that sets forth the "primary duties" for this position.[10] (Def.'s Decl., Docket Entry 29, at ¶ 32; Def.'s Decl., Ex. CC, Docket Entry 29-2, at 358-59.) This job description lists "primary duties" that include, but are not limited to, the following: "[t]ransports students in a wheelchair; positions students in a wheelchair and assists them in and out of their chair . . . [p]hysically assists students up and down steps of bus and is assigned to bus duty daily . . . [p]hysically holds and/or escorts a student in danger of causing injury to themselves or others[.]" (Def.'s Decl., Ex. CC.) BOCES has also submitted notes from Plaintiff's August 30, 2013 meeting with Diamond and McSweeney along with an "Essential

---

[10] The ADA states, with respect to the term "qualified individual" that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." 42 U.S.C. § 12111(8). The record does not indicate whether BOCES' job description was prepared before interviewing Plaintiff. Notably, however, Plaintiff does not argue that this job description was prepared after she was hired. In any event, the Court will consider the job description as evidence of BOCES' judgment as to the essential functions of the teaching assistant position.

Functions Worksheet" that lists the previously noted "primary duties" along with other essential functions of the teaching assistant position. (Def.'s Decl., ¶ 28; Def.'s Decl., Ex. Y, Docket Entry 29-2, at 338-46.) This worksheet states that Plaintiff indicated she could not assist wheelchair-bound students or physically hold or escort students in danger of injuring themselves or others. (Def.'s Ex. Y.)

Plaintiff alleges that her primary responsibility as a teaching assistant was to assist her assigned teacher with "pedagogical" tasks, and asserts that she "rarely, if ever" was asked to assist wheelchair-bound students or assist students up and down steps. (Pl.'s 56.1 Counterstmt. ¶ 11.1.) However, the notion that Plaintiff "rarely" assisted wheelchair-bound students is belied by the fact that she was injured in September 2011 after lifting a wheelchair-bound student over a lip in the classroom's bathroom entrance, as well as the fact that she assisted wheelchair-bound students on and off the bus during her tenure in Bothwell's classroom. (Def.'s 56.1 Stmt. ¶¶ 103, 110; Pl.'s 56.1 Counterstmt. ¶ 103.1.) Although Plaintiff alleges that the 2011-2012 school year was the first year she was required to assist wheelchair students, (Pl.'s 56.1 Counterstmt. ¶ 105.1), and the parties do not dispute that after Plaintiff expressed concerns to Smalling about assisting Bothwell's three wheelchair-bound students on and off the bus, three teacher aides were assigned to

complete that task, (Def.'s 56.1 Stmt. ¶¶ 127, 136-137), Plaintiff does not dispute that "the primary duties of a BOCES Teaching Assistant include transporting students in wheelchairs and assisting students getting on and off the bus during daily 'bus duty (Pl.'s 56.1 Counterstmt. ¶ 104).'" Additionally, when asked what her understanding was of what BOCES teachers assistants do, Plaintiff responded, in relevant part: "[i]ntervene when necessary if there's a problem . . . [i]f a kid acts out or if the child gets hurt." (Pl.' Tr. 11:10-17.)

Finally, to the extent that Plaintiff seeks to draw a distinction between what BOCES' job description labels "primary duties" and the phrase "essential functions" as it appears in the ADA, the Court is not persuaded. (Pl.'s Br. at 13.) Semantics aside, BOCES has alleged that its job description sets forth the essential functions of the teaching assistant position and, as previously noted, BOCES' determination is entitled to significant deference. Notably, Plaintiff does not argue that assisting wheelchair-bound students and/or assisting students in danger of causing harm to themselves or others are not essential functions of the teaching assistant position. (See generally Pl.'s Br. at 22-23.) Plaintiff merely asserts that "Defendant's claim that a non-violent setting was non-existent and that a Teaching Assistant must perform all primary duties of a Teaching Assistant are not supportable." (Pl.'s Br. at 23 (emphasis in original).)

Additionally, Plaintiff has not proffered any evidence with respect to the work experiences of other past or current BOCES teaching assistants.

Accordingly, the Court finds that physically assisting wheelchair-bound students, assisting students with the bus steps, and physically holding a student in danger of causing injury to themselves or others are essential functions of the BOCES teaching assistant position.

"[T]he plaintiff bears the burdens of both production and persuasion as to the existence of some accommodation that would allow [her] to perform the essential functions of [her] employment." McMillan, 711 F.3d at 126 (internal quotation marks and citation omitted). The plaintiff must either: (1) establish that she is able to perform the job's essential functions without accommodation, or (2) "'suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits.'" Pesce, 2016 WL 468244, at *7 (quoting McMillan, 711 F.3d at 127).

Plaintiff argues that BOCES failed to grant her the accommodation of placement in a classroom with non-violent students. (Pl.'s Br. at 22-23.) However, Plaintiff neglects to note that a non-violent setting was not the only accommodation that she required. In each of her requests for a non-violent work setting, Plaintiff also indicated that she was restricted to a

"light duty" environment due to her injuries. (See, e.g., Pl.'s 56.1 Counterstmt. ¶¶ 204-204.1 (In February 2012, Plaintiff requested that she be permitted to return to a "non-violent" or "light duty" environment."); Pl.'s Tr. 185:12-186:21; 190:13-191:5 (Testifying that during a September 10, 2012 meeting, Plaintiff requested to return to a non-violent, light duty assignment.); Pl.'s 56.1 Counterstmt. ¶¶ 241-42 (It is not disputed that Plaintiff continued to request light duty assignments throughout 2013.); Pl.'s Tr. 207:11-18 (Testifying that Plaintiff requested an accommodation "in a non-violent setting, no lifting, no pushing, no pulling.").)

Additionally, Plaintiff submitted doctors' notes to BOCES indicating that she could only return to work with certain physical restrictions. A note from Plaintiff's physician, Dr. Katsigiorgis, dated September 4, 2012, states that Plaintiff could return to "light duty work" with "no lifting pushing or pulling." (Def.'s Decl., Ex. P, Docket Entry 29-2, at 319-20.) Plaintiff also submitted a note from Dr. Krieff, who stated that Plaintiff "is aggravated by any type of heavy lifting, twisting or bending" and that "[s]he definitely would like to go back to work and feels that she can work, however, in a nonviolent atmosphere, which would clearly be the best thing for her." (Def.'s Decl., Ex. V, Docket Entry 29-2, at 331-32.)

Plaintiff also concedes that she repeatedly advised BOCES that she could only return to work if BOCES accommodated the physical limitations recommended by her doctors. Plaintiff testified that during the September 2012 meeting, she indicated that she could not push a wheelchair or lift anything heavy. (Pl.'s Tr. 194:8-13.) During Plaintiff's August 30, 2013, meeting with Diamond and McSweeney, Plaintiff submitted a note from her orthopedist stating that she could return to work with the following restrictions: "[d]esk work only with frequent breaks. No lifting, pulling, pushing, bending, no restraining. [Patient] may sit with frequent breaks." (Def.'s Decl., Ex. X, Docket Entry 29-2, at 336-37; Pl.'s Tr. 208:5-20.) Plaintiff also stated during this meeting that she "couldn't push the wheelchairs, lift the wheelchairs, or restrain students." (Pl.'s Tr. 213:3-9.)

Accordingly, Plaintiff has failed to state a prima facie case that she was qualified to perform the essential functions of her job with an accommodation. The record demonstrates that Plaintiff's December 2011 back injury rendered her unable to push or lift wheelchairs or restrain students; thus, she was unable to perform certain essential functions of her teaching assistant position. Plaintiff has not met her burden of establishing that an accommodation exists that would have enabled her to perform these essential functions.

Furthermore, Plaintiff's request for placement in a non-violent environment is not determinative of her failure to accommodate claim in light of her other physical limitations. Cf. Snowden, 612 F. App'x at 9. Placement in a non-violent setting would not accommodate Plaintiff's inability to push or lift wheelchairs. Indeed, while Bothwell's classroom did not have violence-prone students, Plaintiff undisputedly was required to assist three wheelchair-bound students in that classroom during the 2011-2012 school year. (Pl.'s 56.1 Counterstmt. ¶¶ 103, 103.1.) Additionally, Plaintiff does not dispute that TSP (the location of both Bothwell's and Celiberti's classrooms) "also has frequent student behavioral issues depending on the student." (Def.'s 56.1 Stmt. ¶ 178.)

Plaintiff alleges that BOCES had "desk positions," citing a former BOCES employee who had worked as a teaching assistant in a jail education program and was moved to a desk position where she performed "filing, copying, writing letters--typing letters, anything." (Pl.'s Tr. 171:23-172:8; 174:7-8.) Plaintiff claims that this desk position was a teaching assistant position despite the fact that it involved no interaction with students. (Pl.'s Tr. 174:3-10.) While Plaintiff alleges that she would have accepted such a position, (Pl.'s Tr. 174:11-13), she has not proffered any evidence that such a position was available. See Clark v. Jewish Childcare Ass'n, Inc., 96 F. Supp. 3d 237, 259

(S.D.N.Y. 2015) (Noting that the plaintiff's burden of identifying an accommodation is satisfied by "demonstrate[ing] the existence, at or around the time when accommodation was sought, of an existing vacant position to which she could have been reassigned.") (internal quotation marks and citation omitted). Moreover, even if the jail desk position was available, as previously noted, an accommodation cannot involve the elimination of a job's essential functions. Seeing as the jail desk position involved no contact with students, it is clear that such an accommodation would have resulted in the elimination of the lion's share of the teaching assistant position's essential functions.

Finally, Plaintiff argues that BOCES failed to engage in an interactive process. (Pl.'s Br. at 23.) However, an ADA claim cannot be based upon an employer's failure to sufficiently engage in an interactive process and "evidence of such failure does not allow a plaintiff to avoid summary judgment unless she also establishes that, at least with the aid of some identified accommodation, she was qualified for the position at issue." Snowden, 612 F. App'x at 9-10 (internal quotation marks and citation omitted). In light of Plaintiff's failure to make a prima facie showing that she was qualified for her position with a reasonable accommodation, the Court need not determine whether BOCES sufficiently engaged in an interactive process.

Accordingly, BOCES' motion for summary judgment on Plaintiff's failure to accommodate claim is GRANTED.

IV.  Retaliation

To state a prima facie ADA retaliation claim, a plaintiff must demonstrate that: "'(1) [she] engaged in an activity protected by the ADA; (2) the employer was aware of this activity; (3) the employer took an adverse employment action against [her]; and (4) a causal connection exists between the alleged adverse action and the protected activity.'"  Krachenfels, 2014 WL 3867560, at *17 (quoting Treglia v. Town of Manlius, 313 F.3d 713, 719 (2d Cir. 2002)).  The plaintiff's burden in establishing a prima facie case is "de minimis."  Treglia, 313 F.3d at 719.

"The term protected activity refers to action taken to protest or oppose statutorily prohibited discrimination, and may take the form of either formal or informal complaints."  Hernandez v. Int'l Shoppes, LLC, 100 F. Supp. 3d 232, 267 (E.D.N.Y. Apr. 23, 2015) (internal quotation marks and citation omitted).  However, the employee's complaint must provide the employer with "notice that the plaintiff believed that discrimination was occurring." Id.

The Court construes Plaintiff's opposition as asserting that she engaged in two protected activities: (1) attending the Mayo Clinic, and (2) complaining about Celiberti's conduct to

Smalling.  (Pl.'s Br. at 17-18.)[11]  However, the Court finds that Plaintiff's 2010 visit to the Mayo Clinic does not constitute a protected activity.  Plaintiff does not allege that she suffered any discrimination prior to her visit to the Mayo Clinic and, more importantly, under no circumstances could Plaintiff's request to visit the Mayo Clinic have put BOCES on notice that she believed discrimination was occurring.  Cf. Fratarcangeli v. United Parcel Serv., No. 04-CV-2812, 2008 WL 821946, at *15, n.16 (M.D. Fl. Mar. 26, 2008) (Noting, in connection with the plaintiff's allegation that he advised decisionmakers of a follow-up doctor's appointment two days prior to his termination, that "plaintiff has presented no legal authority, and the court did not locate any, that a doctor's appointment constitutes protected activity.").

BOCES does not appear to dispute that Plaintiff's complaint about Celiberti's conduct--particularly, her comment

---

[11] While not addressed in Plaintiff's opposition, Plaintiff's Equal Employment Opportunity Complaint Intake form, (Def.'s Decl., Ex. L, Docket Entry 29-2, at 305-09), may also constitute a protected activity.  However, the Equal Opportunity Complaint Intake form is dated December 9, 2011 and post-dates all alleged adverse employment actions.  Thus, it cannot form the basis for a retaliation claim.

Additionally, while Plaintiff claims that her contact with Becker's office and Shaw regarding the initial denial of her 2011 summer position application was her first discrimination complaint, the record does not establish that this complaint constitutes a protected activity.  In any event, Plaintiff does not allege that BOCES retaliated against her for complaining about the denial of her summer school application.  (See generally Pl.'s Br. at 17-18.)

that she did not ask for a "deaf assistant"--during her October 2011 meeting with Smalling constitutes a protected activity. The Court finds that Plaintiff's complaint is a protected activity that BOCES was unequivocally aware of.

Plaintiff argues that BOCES took three retaliatory actions against her: (1) refusing to grant her a summer school teaching contract; (2) transferring her out of Bothwell's and Celiberti's classrooms; and (3) transferring her into Sicuranza's classroom with violence prone students. (Pl.'s Br. at 17.) However, Plaintiff's only protected activity was her October 2011 complaint to Smalling about Celiberti. As BOCES refused to grant Plaintiff a full-time summer school teaching contract in the Spring of 2011--prior to Plaintiff's October 2011 complaint--it cannot form the basis for a retaliation claim. Additionally, Plaintiff's transfer to Celiberti's classroom preceded her complaint about Celiberti's comments and similarly cannot form the basis for a retaliation claim. However, as noted above, Plaintiff's transfer to Sicuranza's classroom constitutes an adverse employment action; even though Plaintiff requested a transfer, Sicuranza's classroom was materially different from her prior assignments in that the students were prone to violence. Thus, Plaintiff's transfer may have "'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" Sherman, 71 F. Supp. 3d at 352

(quoting Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68, 126 S. Ct. 2405, 2415, 165 L. Ed. 345 (2006)).

The plaintiff may establish causation by proffering: (1) direct evidence of a retaliatory motive, (2) circumstantial evidence, such as "close temporal proximity between the protected activity and adverse action," (3) evidence that the plaintiff was "treated differently than other employees who did not engage in a protected activity," and (4) "weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." Pediford-Aziz v. City of N.Y., --- F. Supp. 3d ----, 2016 WL 1056659, at *4 (E.D.N.Y. 2016) (internal quotation marks and citations omitted).

Here, the Court finds that Plaintiff has established a prima facie case of retaliation with respect to her transfer to Sicuranza's classroom. Plaintiff's protected activity--her complaint to Smalling regarding Celebriti's "deaf assistant" comment--occurred within days of her transfer to Sicuranza's classroom. (Def.'s 56.1 Stmt. ¶ 163 ("BOCES granted Plaintiff's transfer request before the end of October 2011, and possibly even on the date of her October 26, 2011 request.").) Thus, the extremely close temporal proximity between the protected activity and adverse employment action satisfies causation with respect to Plaintiff's prima facie case. Clark, 96 F. Supp. 3d at 262 ("[T]he close proximity between Plaintiff's return from disability leave

and her termination satisfies the causal element to establish a prima facie case of retaliation.").

However, BOCES has satisfied its burden in proffering a legitimate, non-discriminatory reason for Plaintiff's transfer to Sicuranza's classroom. First, it is undisputed that Plaintiff requested a transfer out of Celiberti's classroom. Second, BOCES alleges that Plaintiff was assigned to Sicuranza's classroom, rather than other locations, because Smalling did not want to place her at a location without an on-site administrator in light of Plaintiff's difficulties working with Bothwell and Celeberti. (Def.'s Br. at 12-13.) Smalling testified that she received complaints about Plaintiff from Bothwell and Celiberti. (Def.'s 56.1 Stmt. ¶¶ 133, 150.) While Plaintiff appears to dispute Smalling's conclusion that she and Bothwell were not an effective team, (Pl.'s 56.1 Counterstmt. ¶¶ 131-131.1), Plaintiff certainly does not dispute that she and Celiberti did not work well together. (See, e.g., Def.'s 56.1 Stmt. ¶¶ 143-145.) The question of which individual is to blame for the interpersonal difficulties is irrelevant; BOCES has established that its desire to place Plaintiff in an available position with an on-site administrator was reasonable in light of the issues that arose with respect to Plaintiff's inability to work with Bothwell and/or Celiberti.

After the first two steps of the McDonnell Douglas test have been satisfied, "the McDonnell Douglas framework disappears,'

and 'the plaintiff must then produce evidence and carry the burden of persuasion that the proffered reason for the allegedly retaliatory conduct is a pretext." Clark, 96 F. Supp. 3d at 262 (internal quotation marks and citations omitted). The plaintiff must establish that the defendant's alleged non-discriminatory explanation is pretextual; at this stage, temporal proximity, without more, will not satisfy the plaintiff's burden. Id. at 262-63.

Here, Plaintiff has failed to satisfy her burden of establishing pretext. Plaintiff merely alleges that "she asked for another transfer and Principal Smalling, without any concern for her well-being and fully knowing Plaintiff's disabilities, [ ] transferred Plaintiff to a classroom with a nice teacher but a classroom with children known to have violent outbursts." (Pl.'s Br. at 18.) This allegation does not suffice to carry Plaintiff's burden of persuasion. Plaintiff has not provided any evidence other than temporal proximity that would support the notion that she was transferred to Sicuranza's classroom in retaliation for complaining about Celiberti.[12] Accordingly, BOCES' motion for summary judgment on Plaintiff's retaliation claim is GRANTED.

_____

[12] Whether a plaintiff is required to demonstrate "but-for" causation with respect to her ADA retaliation claim is an open question in the Second Circuit. See Sherman, 71 F. Supp. 3d at 349. See also Nassry v. St. Luke's Roosevelt Hosp., No. 13-CV-4719, 2016 WL 1274576, at *15, n.10 (S.D.N.Y. Mar. 31, 2016). However, the Court need not determine the appropriate causation

IV.  Hostile Work Environment

        The Second Circuit has not yet determined whether the ADA provides a basis for a hostile work environment claim. Giambattista, 5 F. Supp. 3d at 294.  For purposes of this motion for summary judgment, this Court will assume that a hostile work environment claim is cognizable pursuant to the ADA and will apply the standards for a Title VII hostile work environment claim.  See Forgione v. City of N.Y., No. 11-CV-5248, 2012 WL 4049832, at *7, n.6 (E.D.N.Y. Sept. 13, 2012).

        To establish a hostile work environment claim, the plaintiff must demonstrate that "'the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" Nassry, 2016 WL 1274576, at *8 (quoting Littlejohn v. City of N.Y., 795 F.3d 297, 320-21 (2d. Cir. 2015).  Specifically, the plaintiff "'must plead facts that would tend to show that the complained of conduct:   (1) is   objectively   severe   or   pervasive--that is . . . creates an environment that a reasonable person would find hostile or abusive; (2) creates an environment that the plaintiff subjectively perceives as hostile or abusive; and (3) creates such an environment because of the plaintiff's

_____

standard as Plaintiff has failed to establish causation under either standard.

[disability].'" <u>Giambatista</u>, 5 F. Supp. 3d at 294 (quoting <u>Patane</u>
<u>v. Clark</u>, 508 F.3d 106, 113 (2d Cir. 2007) (alterations in
original)).

The Court must consider the totality of the
circumstances, which include "'the frequency of the discriminatory
conduct; its severity; whether it [was] physically threatening or
humiliating, or a mere offensive utterance; and whether it
unreasonably interfere[d] with [the plaintiff's] work
performance.'" <u>Forgione</u>, 2012 WL 4049832, at *8 (quoting <u>Harris</u>
<u>v. Forklift Sys., Inc.</u>, 510 U.S. 17, 23, 114 S. Ct. 367, 371, 126
L. Ed. 2d 295 (1993) (alterations in original)). However,
"isolated, minor acts or occasional episodes do not warrant relief
under a hostile environment theory." <u>Forgione</u>, 2012 WL 4049832,
at *7 (internal quotation marks and citation omitted). <u>See</u>, <u>e.g.</u>,
<u>Saunders v. Queensborough Comm. College</u>, No. 13-CV-5617, 2015 WL
5655719 (E.D.N.Y. Sept. 24, 2015) (Holding that the plaintiff
failed to state a hostile work environment claim under the ADA
based on "two incidents over a span of two years in which [her
supervisor] made offensive remarks that arguably related to
plaintiff's disability.").

Plaintiff alleges that she has "stated a hostile work
environment claim for the period from September of 2011 when she
was transferred to Celiberti's classroom until December of 2011,
the date she sustained a severe disability in Sicuranza's

50

classroom." (Pl.'s Br. at 20.) Thus, the Court construes Plaintiff's opposition as asserting that Celiberti's classroom and Sicuranza's classroom constituted hostile work environments. To the extent the Complaint can be construed as asserting a hostile work environment claim based on Plaintiff's tenure in Bothwell's classroom, the Court deems that claim abandoned.

Plaintiff testified that Celiberti yelled at her from their very first day working together and told Plaintiff "I don't like you, but I'm stuck with you." (Pl.'s Tr. 125:6-12.) Plaintiff testified that Celiberti discussed Plaintiff's inability to sew with her five or six times, and on one occasion stated in front of the class: "I don't understand how you don't know how to sew. Didn't your mother teach you this? Didn't your mother teach you how to sew." (Pl.'s Tr. 126:13-15; 127:15-17.) Plaintiff testified that Celiberti told her not to touch supplies five or six times. (Pl.'s Tr. 127:2-14.) On one occasion, Celiberti told Plaintiff not to go in the classroom closet. (Pl.'s Tr. 128:2-24.) Plaintiff also testified that Celiberti told her she was "making a spectacle of [her]self" when she was attempting to untangle thread for a student. (Pl.'s Tr. 129:3-14.) However, these episodic comments--none of which overtly reference Plaintiff's disability--are more akin to "mere offensive utterance[s]" than severe and pervasive discriminatory conduct. See Forgione, 2012 WL 4049832, at *7.

Notably, Plaintiff also alleges that when she informed Celiberti about her hearing loss, Celiberti stated, "I didn't ask for a deaf assistant." (Pl.'s Tr. 129:17-130:11.) However, this isolated statement is not sufficiently severe, in and of itself, to "overcome [the] lack of pervasiveness." Saunders, 2015 WL 5655719, at *5 (internal quotation marks and citation omitted; alteration in original). Parenthetically, Celiberti's "deaf assistant" comment was made in response to Plaintiff informing her for the first time that she suffered from hearing loss, and Plaintiff requested a transfer that same day. (Pl.'s Tr. 129:17-21, 130:14-16.) Plaintiff does not dispute that BOCES granted her transfer request "before the end of October 2011, and possibly even on the date of her October 26, 2011 request." (Pl.'s 56.1 Counterstmt. ¶ 163.) Thus, it appears that Celiberti's other alleged offensive comments were made before Celiberti was aware of Plaintiff's hearing impairment.[13]

The Court also finds that Plaintiff has failed to raise any triable issues of fact that Sicuranza's classroom constituted a hostile work environment. Plaintiff has not alleged that Sicuranza ever made any offensive comments or otherwise engaged in discriminatory conduct. Indeed, Plaintiff does not dispute that

---

[13] Plaintiff concedes that Celiberti was not aware of her September 2011 back injury. (Pl.'s Tr. 130:23-131:4.)

she enjoyed working with Sicuranza and her coworkers in his classroom. (Pl.'s 56.1 Counterstmt. ¶ 180.1.)

Accordingly, Defendant's motion for summary judgment on Plaintiff's hostile work environment claim is GRANTED.

CONCLUSION

For the forgoing reasons, Defendant's motion for summary judgment (Docket Entry 28) is GRANTED. The Clerk of the Court is directed to enter judgment accordingly and mark this case CLOSED.

SO ORDERED.

/s/ JOANNA SEYBERT
Joanna Seybert, U.S.D.J.

Dated:     June __23__, 2016
           Central Islip, New York